**AFFIDAVIT OF SPECIAL AGENT DOMINIC GROSS**
**IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Dominic Gross, being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since 2015. I am currently assigned to the Economic Crimes Squad in the FBI's Boston Field Office, where I investigate possible violations of federal law, including wire fraud, bank fraud, money laundering, intellectual property rights violations, bankruptcy fraud, and mortgage fraud. I have received on-the-job training as well as FBI-sponsored training related to these types of investigations, and I have participated in the execution of search, seizure, and arrest warrants related to criminal investigations. My investigations and training have included the use of surveillance techniques, confidential informants, and court-authorized interception of wire and electronic communications.

2.      As an FBI Special Agent, I am empowered by law to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants issued under authority of the United States.

3.      I am currently conducting an investigation of LAJERRAN LONG (also known as "Ljay") ("LONG"), JUDEMARIO JOSAPHAT JR. (also known as "Jude" or "JJ") ("JOSAPHAT"), and others for violations of certain federal laws, including bank fraud, wire fraud, money laundering, and aggravated identity theft.

4.      I make this affidavit in support of a criminal complaint charging LONG and JOSAPHAT with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. Specifically, as set forth below, I have probable cause to believe that LONG and JOSAPHAT conspired with each other and with others to execute a scheme to fraudulently obtain money under the custody

and control of Santander Bank, N.A. ("Santander Bank"), a financial institution as defined in 18 U.S.C. § 20.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

6.      With respect to the transactions described below, I have reviewed bank surveillance photos, as well as Santander Bank records concerning each of the transactions.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED BY LONG AND JOSAPHAT

7.      LONG is currently a resident of Malden, Massachusetts.

8.      JOSAPHAT is currently a resident of Lynn, Massachusetts.

9.      On or about December 30, 2017, an unidentified man, Co-Conspirator 1 ("CC-1") entered a Santander Bank branch located at 51 Pleasant Street in Weymouth, Massachusetts, where CW-1[1] was then employed as a teller. CC-1 approached CW-1 and, according to CW-1, identified himself as a Santander Bank customer, hereinafter referred to as "Victim 1," and produced a fraudulent ID in Victim 1's name. As set forth below, CW-1 has acknowledged that she was aware at the time that CC-1 was not, in fact, Victim 1.

---

[1] CW-1 has pleaded guilty in the United States District Court for the District of Massachusetts to charges of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. CW-1 has entered into a cooperation agreement with the government in the hope of obtaining leniency at sentencing. Information provided by CW-1 has been corroborated by, among other things, bank surveillance photos, bank records, and consensually recorded telephone calls.

10.     Bank records show that CC-1 requested two official bank checks – one for $230,000 and a second for $120,000 – drawn on two of Victim 1's Home Equity Line of Credit ("HELOC") accounts at Santander Bank, ending in 1057 ("SANT-1057") and 8717 ("SANT-8717"). CC-1 also requested a cash withdrawal of $9,000 from the SANT-1057 account.  CW-1 facilitated the processing of both official checks and the cash withdrawal.

11.     Victim 1's spouse and co-account holder was interviewed by FBI agents and confirmed that neither he nor his spouse had authorized anyone to withdraw the funds described above, nor had either ever been to the bank branch where the transactions took place.

12.     As a further part of the scheme, on or about January 13, 2018, a second unidentified man, Co-Conspirator 2 ("CC-2") entered the same Santander Bank branch located at 51 Pleasant Street in Weymouth, Massachusetts. CC-2 approached CW-1 and, according to CW-1, identified himself as a Santander Bank customer, hereinafter referred to as "Victim 2." As set forth below, CW-1 has acknowledged that she was aware at the time that CC-2 was not, in fact, Victim 2. CC-2 requested two official bank checks – one for $280,000 and a second for $167,325 – drawn on Victim 2's HELOC account at Santander Bank, ending in 4111 ("SANT-4111"). CC-2 also requested a cash withdrawal of $9,000 from the SANT-4111 account. CW-1 facilitated the processing of both official checks and the cash withdrawal.

13.     Victim 2 was interviewed by FBI agents and confirmed that the January 13, 2018 transactions in his account were fraudulent, and that he had not authorized anyone to withdraw the funds.

14.     On February 1, 2018, a Boston Police Detective and I interviewed CW-1 regarding the transactions described above. During the interview, CW-1 admitted that she had knowingly facilitated the fraudulent withdrawals from Victim 1's SANT-1057 and SANT-8717 accounts, as

well as the fraudulent withdrawals from Victim 2's SANT-4111 account. CW-1 stated that she was recruited by LONG, who was an acquaintance of hers, to facilitate the withdrawals. CW-1 provided the following additional information:

a.  CW-1 knew LONG through a mutual friend and had LONG's telephone number, (857) 251-7283, in her phone contacts under the name "Ljay," which CW-1 described as LONG's nickname. CW-1 was also connected to LONG via his telephone number on the Snapchat application, under the username "ljaydoee."[2] LONG initially reached out to CW-1 through Snapchat's chat messaging feature. LONG first asked if CW-1 worked at Santander Bank and then began to gauge her willingness to assist in fraudulent bank transactions. LONG told CW-1 that someone with an out-of-state ID needed help getting money out of an account using cashier's checks. After she indicated that she would consider assisting with the transactions, LONG told CW-1 that someone would contact her about the situation and that she should listen to what that individual had to say.

b.  Within a few days of the above-described communication between LONG and CW-1, an individual, whose identity was unknown to CW-1 at the time, contacted CW-1 via Apple's FaceTime video calling feature using the telephone number (781) 584-0952 ("Target Telephone 1"). As set forth below, CW-1 later identified the individual as JOSAPHAT. Following this initial contact, CW-1 and JOSAPHAT

---

[2] I am aware that Snapchat is a multimedia messaging application that enables users to share and send one another photos, video clips, and chat messages, which are usually only available for a short period of time before becoming inaccessible to the recipient(s). Snapchat also has a "story" function which enables users to compile photos and video clips into a storyline that is viewable to their connected contacts for a period of time, typically 24 hours.

typically communicated using FaceTime and sometimes via text message. During their FaceTime calls, JOSAPHAT would typically have his phone lying flat on a surface with the camera pointed upwards, so CW-1 was only able to see the top portion of his head and his hair, which bore distinguishing characteristics.

c.   JOSAPHAT explained to CW-1 that the scheme would involve someone coming into the bank branch where she worked and requesting cashier's checks using an out-of-state form of identification, and that JOSAPHAT would let CW-1 know in advance when the person would be coming into the branch. JOSAPHAT further explained that he wanted assistance from a bank employee, such as CW-1, because he did not want bank employees asking too many questions of the person requesting the cashier's checks.

d.   CW-1 said she initially agreed to assist in the scheme without any promise of compensation. However, after she facilitated the first transactions out of Victim 1's account, JOSAPHAT told CW-1 that she would receive $5,000 per set of transactions. After the second set of transactions took place on or about January 13, 2017, CW-1 received $2,000 from LONG. CW-1 received this money from LONG in person at LONG's residence. CW-1 said she did not receive any additional funds or other form of compensation for her participation in the scheme.

15.   Based on her interview with law enforcement agents, another interview with bank personnel, and her admission to participating in the fraud scheme, CW-1's employment at Santander Bank was terminated. Since then, CW-1 has been cooperating with the government's investigation, and, as set forth above, the information she has provided has been corroborated by,

among other things, bank surveillance photos, bank records, and consensually recorded telephone calls.

## Identification of CW-1's FaceTime Handler as JOSAPHAT

16.     CW-1 has assisted law enforcement agents in identifying her FaceTime handler as JOSAPHAT.[3] Specifically, CW-1 recalled observing a social media post by LONG, possibly on his Snapchat "story," displaying an individual who bore distinguishing head and hair characteristics very similar to those CW-1 had observed during her FaceTime calls with JOSAPHAT. CW-1 also recalled that LONG's post referenced a social media handle of "kingjosaphat" for this individual. After looking up the handle "kingjosaphat" on social media platforms, CW-1 discovered a Twitter account under the same handle with profile photos matching the head and hair characteristics of her FaceTime handler. The same Twitter account page included a profile backdrop photo of a newspaper article detailing the high school and college football path of Lynn resident Judemario Josaphat.

17.     CW-1 was also able to take a cell phone screenshot of her FaceTime handler during one of their FaceTime calls, which captured the top half of her handler's face.

18.     I have reviewed the "kingjosaphat" Twitter account and compared photos from the account to JOSAPHAT's Massachusetts driver's license photo. Based on that review, I believe the "kingjosaphat" Twitter account belongs to JOSAPHAT. I have also compared photos from the "kingjosaphat" Twitter account and JOSAPHAT's driver's license photo to CW-1's screenshot capturing her FaceTime handler. Based on that comparison, I believe CW-1's FaceTime handler

---

[3] On September 2, 2020, law enforcement agents approached JOSAPHAT and questioned him regarding his involvement in the scheme. JOSAPHAT denied any involvement, repeatedly telling agents, "I don't know what you're talking about."

to be JOSAPHAT.   Finally, I have reviewed a Facebook account under the name "Judemario Josaphat" and an Instagram account under the handle "kingjosaphat," which at the time contained identical profile photos to those from the "kingjosaphat" Twitter account, and I believe that those Facebook and Instagram accounts also belong to JOSAPHAT.

19.     Pictured below are: (a) the cell phone screenshot taken by CW-1 during one of the FaceTime calls with her handler, (b) JOSAPHAT's Massachusetts driver's license photo, and (c) a profile photo featured on the above-referenced Twitter, Instagram, and Facebook accounts.



(a)

(b)

7



(c)

20.     Cellular GPS pings on Target Telephone 1, physical surveillance, and telephone call and subscriber records further support the identification of CW-1's FaceTime handler as JOSAPHAT.

21.     On several occasions, cellular GPS pings on Target Telephone 1 located the phone within the range of JOSAPHAT's residence in Lynn, during which time agents observed JOSAPHAT's registered vehicle parked in the driveway of his residence.

22.     While conducting physical surveillance, I observed JOSAPHAT sitting in his registered vehicle on Cherry Street in Salem, Massachusetts, during which time GPS pings on Target Telephone 1 located the phone in that vicinity.

23.     While conducting physical surveillance the evening of February 27, 2018, agents tracked GPS pings on Target Telephone 1 from the vicinity of JOSAPHAT's residence in Lynn to the neighboring town of Saugus, Massachusetts, where a precise GPS ping located the phone in the direct vicinity of a T-Mobile store. Very shortly thereafter, the GPS pings failed to locate the phone, indicating an interruption or termination of service on the phone number. I observed JOSAPHAT returning to his residence in his registered vehicle later that evening. In an interview the following day, an employee of the T-Mobile store in Saugus identified a photo of JOSAPHAT as a customer who had changed his telephone number the prior evening while maintaining the

same device. Records subsequently received from T-Mobile confirm that Target Telephone 1 was assigned a new telephone number on February 27, 2018.

### Consensually Recorded Calls between CW-1, LONG, and JOSAPHAT

24.     Between approximately February 6, 2018 and February 12, 2018, CW-1, at the direction of FBI agents, engaged in a series of consensually recorded telephone calls with LONG and JOSAPHAT.[4] The calls, as well as other communications from the same time period, confirm the participation of LONG and JOSAPHAT in the above-described bank fraud scheme.

25.     In a consensually recorded call with LONG on or about February 7, 2018, CW-1, acting at the direction of agents, told LONG that she believed she was owed more money for her participation in the scheme. During the call, LONG acknowledged having paid CW-1 $2,000 and explained how the fraudulently obtained funds were distributed to other co-conspirators. The following are excerpts from the call:[5]

> LONG: You are making it seem like I'm trying to gyp you. Like yo, I'd even touch two
>
> bands. I gave you more than I kept for myself. I gave "JJ" 1.5, I gave you two, and I kept
>
> the rack.[6] And the whole reason, they still owe me money but I can't get mad at them.

---

[4] I have listened to all of the consensually recorded calls between CW-1 and her FaceTime handler believed to be JOSAPHAT. I have also obtained and reviewed several videos from JOSAPHAT's above-referenced social media accounts, in which JOSAPHAT can be seen and heard speaking. Based on my review and comparison of JOSAPHAT's voice in his social media videos and the voice of CW-1's FaceTime handler, I believe the voice on the consensually recorded calls between CW-1 and her FaceTime handler to be that of JOSAPHAT.

[5] Excerpts of consensually recorded calls as set forth herein are based on draft transcripts of those recordings.

[6] Based on my training and experience, I am aware that the terms "band" and "rack" are slang for $1,000, typically in cash.

Because if I get mad at them they don't break me off. You get what I'm trying to say? So like off rip, you're supposed to get the most money. So obviously I told you like I said I am going to take care of you no matter what.

[…] So whatever we did that… $9,000 that they take out in cash or whatever, the [racial epithet] that goes into the bank is 2.5, and then Jude[7] takes his cut, and then we split like six right then and there or whatever the case may be— he might charge us for four. You're gonna get three, I'm gonna take one. You get what I am trying to say? I always give you more.

[…] So whatever we touch, I always make sure you get it first. Like it doesn't go to "JJ's" hands, you feel me? It comes to my hands, and then whatever I decide to give him is part of my cut too. Like I didn't… I wouldn't have to give him money if he didn't tell me that you worked at the bank. You know what I mean?  […] I'm giving it to him off the string. So say we get four, I give you… I give you 3—3.5, me and "JJ" might split 250. Me and "JJ" we see it as free bread, you feel me? I just want to make sure you're happy just in case anything ever went south, which it doesn't, you know what I mean? The only time it goes south is on their end when it [the bank account] goes negative. They have to handle that. That doesn't have nothing to do with you.

26.     In a consensually recorded call on or about February 9, 2018, CW-1 and JOSAPHAT discussed plans to conduct another series of fraudulent transactions the following day

---

[7] Based on the investigation, I believe "JJ" and "Jude," which LONG appears to use interchangeably, are references to JOSAPHAT.

– Saturday, February 10, 2018.[8] CW-1, acting at the direction of agents, told JOSAPHAT that she was no longer planning to work at the bank that day. JOSAPHAT responded, in sum and in substance, that he already had someone flying in from New York to conduct the transactions and that if CW-1 did not work at the bank that day, it would disrupt their plans. The following is an excerpt from the call:

> CW-1: I just wanted to tell you. I'm not going to be at the bank on Saturday so I don't know if you all were still going to do it. Because the other job I have sometimes I got to work on Saturdays. But they pay me more so I am going to be in there on Saturday instead.
>
> JOSAPHAT: […]  It's just that I had somebody coming from New York to come do it for this weekend and he is already over here so now I got to […] Yeah so damn. I just got to buy nine people's flights back to New York which is a big ass process.

27.    After the above-described call with JOSAPHAT, CW-1 received a series of Snapchat messages from LONG, to which CW-1 responded at the direction of agents. The exchange was immediately captured by agents due to the expiring nature of Snapchat messages. During the exchange, LONG expressed his frustration that CW-1 would no longer be working at the bank the following day. The following is an excerpt from the chat exchange:

> LONG: So you not working tomorrow ? You kinda fucked up big time and you don't want money like whats going on [.] He paid for the peoples flights and all that to come do what they gotta do so it looks bad on you if you didn't wanna do it shouldve just said thst [sic] now [racial epithet] is looking at you funny and don't wanna get bread w you[.]
>
> CW-1: No I need money before I take the check out [.] I told you that[.]

---

[8] Agents directed CW-1 to give LONG and JOSAPHAT the impression that she was still employed by Santander Bank at the time of these communications.

LONG: You're a clown you didn't say that on the phone smh[.] We gone pay you a rack so what you wanna do[.]

CW-1: Before Saturday?

LONG: Hes gonna give you 1000$ tomorrow and im coming my pocket 500$ for you smfh[.] Your really a clown tbh but im trynna keenyou [sic] happy so we can make more money[.] But I really cant believe you[.]

28.     In a consensually recorded call later the same day, CW-1, acting at the direction of agents, suggested to JOSAPHAT that she introduce him to another teller who would be willing to facilitate the fraudulent transactions the next day.[9] The following is an excerpt from the call:

CW-1: […] Because I told Ljay that there is a girl that is a teller, the one that took my shift. She's cool. I told her I got a little business, whatever blah, blah, blah. She said that she will do it if you need me to. She owes me a favor anyway. I told her I would give her a rack. So I don't know if you want to still want to try and do it. If you want to think about it get back to me. Because we could do it tomorrow.

JOSAPHAT: […]  Is there any way you can get a picture of her? […] Because these dudes are strict. They are going to want to know what she looks like. They are already expecting it to be you.

29.     In a consensually recorded call on or about February 11, 2018, CW-1, acting at the direction of agents, suggested to JOSAPHAT that the transactions be conducted the following day, when the other teller was purportedly scheduled to be working. JOSAPHAT responded, in sum and in substance, that they should instead plan to have their co-conspirators travel back to the area

---

[9] In fact, there was no such teller, and the planned transactions never took place.

to conduct the transactions that Saturday, February 17, 2018, when JOSAPHAT believed CW-1 would be working at the branch again. JOSAPHAT then asked CW-1 about the bank's procedures for verifying customers' identification. The following are excerpts from the call:

> JOSAPHAT: But umm, when they come to you and they ask for two forms of ID, what ID, what, what do you usually do?
>
> […]  So what if I have an ID and a card to the business like a credit card?
>
> CW-1: Yeah. That's fine. So if you have like a debit or a credit card that's with our bank they just have you swipe it on the little machine and do the PIN for it.
>
> JOSAPHAT: Oh okay, my thing is like, like when we go to you give me the exact run down that you […] because I know he has real ones and fake cards. So it's like, there's cards that he'll swipe, and if he swipes it might not match up to what, um, like what they're supposed to see. But I know if you take the license and plug that all in, it's all going to match up.
>
> […]  That's the thing like […] well it don't matter that it's your branch, but it's a Santander but it's like a duplicate you get what I'm saying? So it's like a fake card.

## CONCLUSION

30.     Based on my knowledge, training, and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that LONG and JOSAPHAT conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1349.

Respectfully submitted,

_____
Dominic Gross
Special Agent
Federal Bureau of Investigation

Electronically subscribed and telephonically
sworn to before me on September _4_, 2020

_____
THE HON. JENNIFER C. BOAL
United States Magistrate Judge

14